MICHAEL L. BECKER
Nevada Bar No. 8765
ADAM M. SOLINGER
Nevada Bar No. 13963
LAS VEGAS DEFENSE GROUP, L.L.C.
6655 W. Sahara Avenue, STE C216
Las Vegas, NV 89146
Telephone - (702) 333-3673
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>vs.<br><br>**PAUL HYON KIM**,<br><br>Defendant. | **CASE NO.: 2:25-mj-00261-EJY**<br><br>**DEFENDANT PAUL KIM'S SENTENCING MEMORANDUM** |

Defendant Paul Hyon Kim, through his counsel, respectfully submits this Sentencing Memorandum and Response to the United States' Sentencing Memorandum (ECF No. 56). Mr. Kim asks the Court to overrule the government's objection, to decline to apply the terrorism adjustment under U.S.S.G. § 3A1.4, to adopt the guideline calculation in the Presentence Investigation Report (total offense level 25, Criminal History Category I, advisory range 60 to 71 months), and to impose a sentence of 60 months' imprisonment on each count, to run concurrently, followed by three years of supervised release. This Memorandum is based on the attached Points and Authorities, the PSR, the exhibits submitted herewith, and any argument the Court may entertain at the sentencing hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Paul Kim committed a serious crime, and he has owned it. In the early morning hours of March 18, 2025, he shot out security cameras, shot and broke the windows of Tesla vehicles parked outside a Tesla collision-repair shop in Las Vegas, threw three Molotov cocktails, and painted the word "RESIST" on the door. Five privately owned cars were destroyed or damaged. No one was hurt. Mr. Kim, a 37-year-old man with no prior criminal history, pleaded guilty to every count of the Indictment without a plea agreement. He faces a five-year mandatory minimum sentence.

The only real question at sentencing is whether this crime is a "federal crime of terrorism." The United States Probation Office, having reviewed the same evidence the government relies on, concluded that it is not. PSR at 28-29. The government disagrees and asks the Court to add twelve offense levels, to place Mr. Kim, a zero-point offender, in Criminal History Category VI, and to impose a 240-month sentence, four times the bottom of the correctly calculated range.

The adjustment does not apply, for a reason rooted in the plain text Congress wrote. Section 3A1.4 incorporates the definition of "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5), which requires proof that the offense was "calculated to influence or affect the conduct of *government* by intimidation or coercion, or to retaliate against *government* conduct." 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). Political motivation is not enough. Violence intended to frighten or send a message to private businesses, private individuals, or the public at large is not enough. Congress knew how to reach that conduct: in the very same chapter of the Code, and in the very same enactment, it defined "domestic terrorism" to include acts intended "to intimidate or coerce a civilian population." 18 U.S.C. § 2331(5)(B)(i). It omitted that language from § 2332b(g)(5)(A). And for twenty-three years the Sentencing Commission's own commentary said precisely what

that omission means: an enumerated offense committed with a motive "to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government," falls *outside* § 3A1.4.

Every target here was private. The vehicles belonged to private individuals. The building was a private repair shop. Mr. Kim made no demand of any government, issued no communiqué, claimed no responsibility, publicly referenced no government official, agency, program, or policy, and did everything he could to avoid being identified. The government's case for the adjustment rests on a chain of inference that runs from a one-word slogan, through Mr. Kim's lawful political associations and internet searches (none of which mentions any government policy, program, or official, DOGE, or Elon Musk), to the fact that the chief executive of Tesla, a publicly traded private company, also held an advisory government role. That chain does not establish, by any standard of proof, that this offense was *calculated* to coerce or retaliate against *government*. Courts that have confronted politically motivated arson of private property, including the District of Oregon in the Earth Liberation Front prosecutions affirmed by the Ninth Circuit, have declined to stretch the adjustment that far.

Nor would a 240-month sentence be consistent with how federal courts across the country have sentenced comparable, and in many cases more dangerous, politically motivated arsons, including the only other Tesla-related arson sentencing Mr. Kim has located, in which the District of Arizona imposed the 60-month mandatory minimum. A sentence of 60 months, as the Probation Office recommends, is sufficient but not greater than necessary to serve the purposes of 18 U.S.C. § 3553(a).

## II. BACKGROUND

### A. Procedural History and the Competing Guideline Calculations

Mr. Kim was arrested on March 26, 2025, and has been detained ever since. PSR at 2, ¶ 4. On April 9, 2025, a grand jury returned a four-count Indictment charging two counts of arson of property used in interstate commerce and one count of attempted arson, each in violation of 18 U.S.C. § 844(i), and one count of possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). ECF No. 23. On February 23, 2026, Mr. Kim pleaded guilty to all four counts without the benefit of a plea agreement. PSR ¶ 3.

The PSR groups Counts 3 and 4 under § 2K2.1 (adjusted offense level 26) and calculates Counts 1 and 2 under § 2K1.4 (adjusted offense level 20 each), applying the base offense level for offenses that created a substantial risk of death or serious bodily injury. PSR ¶¶ 25-45. After the multiple-count adjustment and a three-level reduction for acceptance of responsibility, the total offense level is 25. PSR ¶¶ 46-53. Mr. Kim has no criminal history points, placing him in Criminal History Category I. PSR ¶¶ 56-57. The resulting range of 57 to 71 months becomes 60 to 71 months by operation of the statutory minimum. PSR ¶ 104. The Probation Office found no victim-related adjustment applicable and recommends a sentence of 60 months. PSR ¶¶ 30, 36, 42; PSR at 23-24.

The government objects, contending that § 3A1.4 applies to Counts 1 through 3, that each group therefore carries an adjusted offense level of 32, that the combined offense level is 35, and that the total offense level is 32. ECF No. 56 at 5-7. Under § 3A1.4(b), the government contends,

Mr. Kim's criminal history category becomes VI, yielding an advisory range of 210 to 262 months. *Id.* at 7-8. The government asks for 240 months. *Id.* at 9.[1]

**B. Paul Kim**

Paul Kim was born in Namwon, South Korea, on September 6, 1988, and came to the United States with his mother as an infant; he is a United States citizen. PSR ¶¶ 62-63. He was raised in Washington State by immigrant parents who worked their way from running a gas station and a teriyaki restaurant to owning a motel. PSR ¶¶ 63, 77. His father was physically and verbally harsh with him. PSR ¶ 64; Ex. A at 3.

From early childhood, Paul struggled in ways his family could see but never fully understood. His mother describes a hyperactive child who had persistent difficulty forming relationships with other children. She enrolled him in a developmental preschool from age three to five, volunteered in his classroom from kindergarten through fourth grade so she could watch over him, and took him to a specialist for an autism evaluation in the fourth grade, though the family could not complete the recommended follow-up. PSR ¶¶ 71, 86. His parents had to walk him through his middle school schedule because he could not find his classes. PSR ¶ 72. As the only Asian family in a predominantly white neighborhood, he was bullied by classmates for his appearance, and by a fourth-grade teacher who told him and his parents he was "stupid" and would never graduate. PSR ¶ 78; Ex. A at 3. He was diagnosed with ADHD in high school and "barely passed." PSR ¶¶ 81, 93.

[1]Mr. Kim does not adopt the government's arithmetic and reserves all objections to any alternative calculation. The point for present purposes is simply that the government's position roughly quadruples the bottom of the advisory range, from 60 to 210 months, and converts a first-time offender with zero criminal history points into a Category VI offender.

With medication and structure, Paul did better in college. He studied film and video production at Central Washington University, made the Dean's List, and completed all but one credit of his degree. PSR ¶ 92; Ex. A at 6. Even then, his parents picked him up from his dormitory on weekends because he had no friends to spend them with. PSR ¶ 73. He built a working life in the film and television industry, first as a transcriber at a Seattle production company, then as a production assistant in Los Angeles, then, after five years as a restaurant busser in Henderson, as a freelance cinematographer and production assistant in Las Vegas, including on multiple seasons of nationally broadcast television series. PSR ¶¶ 94-97.

Paul has struggled with depression for most of his life. In 2017, feeling that he had no future, he put a gun to his head and did not pull the trigger only because he thought of what it would do to his family. PSR ¶ 82; Ex. A at 4. His depression returned during the pandemic, when he briefly drank to "numb the pain" and then, at his brother's urging, sought therapy that he found helpful. PSR ¶¶ 82, 89. In 2024 he experienced what his brother describes as a week of mania followed by depression. Ex. A at 5. At the Nevada Southern Detention Center, he has been treated for bipolar affective disorder, anxiety, and a manic episode with the mood stabilizer oxcarbazepine. PSR ¶ 84. The defense's forensic psychologist, Dr. John Paglini, has diagnosed Bipolar II disorder and schizoid personality traits, reflecting a lifelong pattern of isolation: Paul has never had a romantic relationship and has no friends outside his family. Ex. A at 6, 13.

Before this offense, Paul had never been arrested. His only prior convictions are a traffic citation and a driver's license infraction. PSR ¶¶ 55-57. His brother describes him as a "long time liberal" who had attended a few peaceful marches, who never talked about Elon Musk, and who never expressed violent rhetoric toward anyone. Ex. A at 7. His family was shocked by his arrest. *Id.* In more than eighteen months of detention, Paul has had no disciplinary record and has worked

in the jail kitchen since May 2025. PSR ¶ 4. His parents and siblings remain devoted to him, and he will live with them in Washington upon release. PSR ¶¶ 76, 88.

**C. The Offense**

Mr. Kim does not dispute the essential facts. At approximately 2:30 to 2:45 a.m. on March 18, 2025, he went to the Tesla Collision Center on West Badura Avenue in Las Vegas, a Tesla-branded repair facility. PSR ¶ 5. He shot out two exterior security cameras, painted "RESIST" on the entrance door, fired at and broke windows of Tesla vehicles parked outside, and threw three Molotov cocktails into three of them. PSR ¶¶ 6, 8. Two ignited; fire spread to two adjacent vehicles; the third device did not ignite. PSR ¶¶ 8, 19. Five vehicles were damaged or destroyed, four owned by private individuals and one by the repair shop, and Tesla's insurer has compensated the vehicle owners. PSR ¶ 21. Mr. Kim had powered off his phone, parked some distance away, and left on foot before police and fire personnel arrived. PSR ¶¶ 6, 12. Significantly, no one was injured. PSR at 24.

The offense occurred amid a highly publicized series of attacks on Tesla property around the country, and the investigating detectives themselves noted those earlier incidents. PSR ¶ 7. Mr. Kim's search history shows that he searched for news of those attacks, including "Tesla Oregon attack" and "Salem tesla arson," as well as queries about how police investigate crimes. PSR ¶ 15. As Mr. Kim told Dr. Paglini, he "obtained the idea of damaging the Tesla vehicles from listening to the news and seeing that other people engaged in similar behavior across the United States." Ex. A at 8. His brother, too, believes that Paul "acted as a copycat" after seeing "the patterns" on social media. Ex. A at 7.

Mr. Kim chose the middle of the night "because he did not want anyone hurt." Ex. A at 8. He told Dr. Paglini that the car owners "were not specifically targeted," that he was trying to "send

a message" to Mr. Musk about a gesture Mr. Musk made at a January 20, 2025 inauguration-day rally that Mr. Kim perceived as a Nazi salute, and that he "felt he had to do something to make others aware" of what he perceived as a rising tide of fascist ideology. Ex. A at 8, 12. He wrote "RESIST," he explained, because "at the time he felt like the world was ending." *Id.* at 8. Today he recognizes how wrong he was: "I definitely overreacted. I regret what I did to all the people, for all the pain I caused the owners of the cars, my family, and everyone involved." *Id.*

## III. THE TERRORISM ADJUSTMENT DOES NOT APPLY

### A. The Governing Standard

Section 3A1.4(a) provides a twelve-level increase, to a minimum of level 32, "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." Section 3A1.4(b) then places the defendant in Criminal History Category VI regardless of his actual record. The Guideline adopts the statutory definition of "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4, comment. (n.1). That definition has two elements, both of which the government must prove. The offense must (A) be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (B) be a violation of an enumerated statute. 18 U.S.C. § 2332b(g)(5)(A)-(B). Mr. Kim does not dispute that § 844(i) is enumerated. The dispute concerns element (A) alone.

The Ninth Circuit has made clear that element (A) imposes a *specific intent* requirement. *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020). The enhancement "does not automatically apply" even to offenses that are themselves terrorism-related; the government must prove that the defendant specifically intended that his offense influence or affect the conduct of government by intimidation or coercion, or retaliate against government conduct. *Id.* at 699. The word "calculated" directs the inquiry to the *object* of the offense, not the defendant's general

beliefs: "'[C]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance," whereas "motive is concerned with the rationale for an actor's particular conduct." *Id.* at 703 (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)); *see also United States v. Stewart*, 590 F.3d 93, 137-38 (2d Cir. 2009) (explaining that "calculated" concerns what the offense was planned to achieve). And as to the retaliation prong specifically, the Ninth Circuit has observed that "[c]ases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government action." *Alhaggagi*, 978 F.3d at 703. As the government's own authority puts it, "it is the defendant's purpose that is relevant." *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004); ECF No. 56 at 5.

The government bears the burden of proof. After *United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (en banc), that burden is a preponderance of the evidence.[2] But the burden is real, and it attaches to a specific finding: that *this offense* was calculated to coerce or retaliate against *government*. The Court must resolve that question on the record and make particularized findings; it may not presume the requisite intent from the nature of the offense or the defendant's views. *See Alhaggagi*, 978 F.3d at 703; *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) (vacating application of § 3A1.4 where the district court failed to resolve disputed facts and make findings on the defendant's intent). The government is correct that a defendant may act with more than one purpose and that the adjustment can apply if one of them is to influence government. ECF No. 56

---

[2]In *Alhaggagi*, the Ninth Circuit held that the government was required to prove the enhancement's intent element by clear and convincing evidence because of its extremely disproportionate effect on the sentence. The en banc court later held that facts found under the advisory Guidelines need only be proven by a preponderance of the evidence, overruling *United States v. Staten*, 466 F.3d 708 (9th Cir. 2006), and its progeny, and explained that concerns about enhancements with outsized effects are to be addressed through reasonableness review under *Booker* and § 3553(a). *United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (en banc). *Lucas* changed the standard of proof; it did not change the substantive specific-intent requirement that *Alhaggagi* enforces, and it did not relieve the government of its burden.

at 5-6 (citing *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018), and *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014)). But that principle presupposes proof that at least one purpose actually *was* directed at government. It does not relieve the government of proving one.

**B. Section 2332b(g)(5)(A) Reaches Only Offenses Directed at Government, Not Political Violence Against Private Targets or the Public**

**1. The statutory text and structure**

The definition § 3A1.4 incorporates is deliberately narrow. It speaks only of the "conduct of government" and "government conduct." 18 U.S.C. § 2332b(g)(5)(A). It says nothing about businesses, private individuals, the public, or ideological opponents.

That omission is not an accident. In the same chapter of Title 18, Congress defined "domestic terrorism" as dangerous criminal acts that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(5)(B). Congress enacted that definition in the USA PATRIOT Act of 2001, which in the same enactment also amended the definition of "federal crime of terrorism" in § 2332b(g)(5). Pub. L. No. 107-56, §§ 802, 808, 115 Stat. 272 (2001). Congress therefore had before it, and adopted, a definition of terrorism that reaches efforts to intimidate or coerce the civilian population, and it chose *not* to include that concept in § 2332b(g)(5)(A). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Whatever the rhetorical appeal of calling politically motivated property destruction

"terrorism," the sentencing adjustment Congress directed applies only when the offense targets *government*.

**2. The Sentencing Commission long recognized this limit**

For more than two decades, the Sentencing Commission's commentary to § 3A1.4 codified exactly this distinction. Former Application Note 4, added in 2002, addressed cases in which "the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, comment. (n.4(B)) (2024). In such cases, the adjustment did *not* apply. *Id.* The Commission thus recognized, in the plainest terms, that an enumerated offense such as § 844(i) arson committed with a motive to intimidate civilians is categorically different from a federal crime of terrorism.

Effective November 1, 2025, as part of its restructuring of the Guidelines Manual to remove most departure provisions, the Commission relocated former Application Note 4 to Appendix B. The Commission described that restructuring as outcome-neutral, and nothing in it expanded the reach of § 3A1.4 or altered the statutory definition the Guideline incorporates.[3] The text of § 2332b(g)(5)(A) remains exactly what it was when the Commission explained that civilian-directed political violence falls outside it.

[3] U.S.S.G. App. B, Pt. III (Nov. 2025) (compiling former § 3A1.4, comment. (n.4)); U.S.S.G. App. C, amend. 836 (Nov. 1, 2025). In removing departure provisions from the body of the Manual, the Commission explained that the change was intended to be outcome-neutral and that courts would retain authority to rely on the same considerations when determining whether to impose a sentence outside the guideline range as a variance. Nothing in Amendment 836 purported to expand the scope of § 3A1.4 itself or the statutory definition it incorporates.

**3. Courts have applied that limit to politically motivated attacks on private targets**

Courts applying § 3A1.4 have honored this line. The most instructive decisions come from within this Circuit, in the Earth Liberation Front ("ELF") and Animal Liberation Front prosecutions known as Operation Backfire, which involved a years-long campaign of ideologically driven arsons in Oregon and elsewhere. In a comprehensive pre-sentencing opinion, Judge Aiken of the District of Oregon held that because § 2332b(g)(5)(A) requires an intent to influence, affect, or retaliate against the conduct of *government*, the government was required to prove that the defendants targeted government conduct, rather than the conduct of private individuals or corporations, for each arson on which it relied. *United States v. Thurston*, No. 6:06-cr-60070-AA, ECF No. 35 (D. Or. May 21, 2007) (slip op. at 34-39). The court distinguished arsons of government facilities, such as Forest Service ranger stations and Bureau of Land Management corrals, from arsons of private businesses such as lumber companies, a tree farm, a meat-packing plant, a car dealership, and a ski resort, which could support the adjustment only upon proof that they were aimed at government conduct.[4]

Applying that rule, Judge Aiken declined to apply § 3A1.4 to Kendall Tankersley, whose offense involved the arson of the headquarters of U.S. Forest Industries, a private timber company, causing nearly $1 million in damage. The government's case for the adjustment there was considerably stronger than it is here. The government argued that the company was well known for its extensive federal logging contracts, that the ELF communiqué issued after the fire warned "all others responsible" for the loss of wild forests (which included federally owned timberland),

[4] In *Thurston*, Judge Aiken further held that the government could not rely on the Application Note 4 departure because that note post-dated the defendants' conduct; the substantive point relevant here is her holding that § 2332b(g)(5)(A) requires proof that the defendants targeted government conduct, as distinct from the conduct of private individuals or corporations.

and that Ms. Tankersley had researched the company's federal contracts and frequently spoke out publicly against the government.[5] The court nonetheless found the government had not proven that the arson was calculated to retaliate against government conduct, emphasizing that the communiqué did not mention any conduct of government. The court instead accounted for the defendant's intent to frighten and intimidate private actors through a separate upward departure and, even after doing so, imposed a sentence of 41 months, which the Ninth Circuit affirmed as reasonable. *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008).

The Eleventh Circuit drew the same line in *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005). There, the defendant planned to bomb abortion clinics, an ideologically driven plot against private targets intended to dissuade doctors from performing abortions. The dispute there proceeded not under § 3A1.4 itself, but under former Application Note 4's separate provision for enumerated offenses committed with a motive to intimidate or coerce a civilian population, and the Eleventh Circuit remanded for the district court to consider a departure on that basis. *Id.* Politically motivated violence against private targets, in other words, was treated as outside the adjustment.

By contrast, the cases in which courts have applied § 3A1.4 to domestic arson or bombing involve a direct nexus to government: the target was itself a government facility or instrumentality, or the defendant expressly sought to change government action. *See, e.g.*, *United States v. Christianson*, 586 F.3d 532 (7th Cir. 2009) (arson of a U.S. Forest Service research station); *United States v. Dowell*, 430 F.3d 1100 (10th Cir. 2005) (arson of an Internal Revenue Service office); *Mandhai*, 375 F.3d at 1248 (plot to bomb infrastructure in order to compel the government to

[5] See Brief for the United States in Opposition, *Tankersley v. United States*, No. 08-1104 (U.S. 2009) (describing the government's theory and the district court's ruling).

release Muslim prisoners and change its policies); *Van Haften*, 881 F.3d at 544-45 (defendant sought to retaliate against the United States for its military actions against ISIS). None of the cases on which the government relies involved private property owned by private individuals with no government nexus beyond the defendant's generalized political views.

**C. The Record Does Not Show That Mr. Kim's Offense Was Calculated to Influence or Retaliate Against Government**

The government's argument, in substance, is that Mr. Kim had no personal or business relationship with the collision center or the car owners; that he painted "RESIST"; that his internet searches "set out his political motivation"; and that his choice of a firearm and Molotov cocktails shows a purpose "to capture public attention." ECF No. 56 at 6-7. From these facts, the government concludes that "[t]he available evidence does not support any other conclusion" than that the attack was calculated to coerce or retaliate against government. *Id.* at 7. Each premise, examined honestly, shows at most political motivation directed at a private company, its chief executive, and the public, which is the very category Congress excluded.

**1. Every target was private**

Mr. Kim did not attack a government building, a government vehicle, a government employee, or a government function. He attacked five cars parked at a Tesla-branded repair shop. The PSR identifies the owners: four private individuals and the collision center itself. PSR ¶ 21. No government entity suffered any loss, and no government operation was disrupted. The government does not contend otherwise. Indeed, the government's own description of the offense concedes the point: it characterizes the victims as "[s]ymbolic," having "no real relation to the perpetrator's discontent," and "effectively random." ECF No. 56 at 9. That is an accurate

description of violence directed at the civilian population. It is not a description of an offense calculated to coerce government.

**2. Mr. Kim communicated nothing to any government**

An offense can hardly be calculated to coerce a government that is never told what it is supposed to do, or even that it is the intended audience. Here, no government was ever addressed. Mr. Kim issued no communiqué, made no demand, posted nothing claiming responsibility, and contacted no official. To the contrary, he acted in the middle of the night, shot out the security cameras, powered off his phone, parked far away, fled on foot, and, when questioned, denied involvement. PSR ¶¶ 6, 8, 11-12. Conduct designed to ensure that no one would ever know who did it, or why, is the antithesis of a calculated effort to force a government to change course. In *Tankersley*, the arsonists issued a communiqué denouncing those responsible for the destruction of forests, and the target held federal timber contracts, yet the district court still found the nexus to government conduct unproven because the communiqué did not mention any conduct of government. Here there is no communiqué at all.

**3. "RESIST" does not name or address any government conduct**

The single word Mr. Kim painted on a private repair shop's door names no government, official, agency, program, or policy, and makes no demand. "Resist" is a generic slogan of political dissent. Mr. Kim explained to Dr. Paglini that he wrote it because "he felt like the world was ending" and meant it as an exhortation to resist what he perceived as a spreading fascist and white-supremacist ideology. Ex. A at 8, 12. That is an expression of political alarm addressed only to the public, if anyone. It shows motive, which the statute does not reach, *see Awan*, 607 F.3d at 317; it does not show a calculated object of coercing government.

**4. The internet searches confirm imitation and evasion, not a government-directed purpose**

The government describes Mr. Kim's searches as "set[ting] out his political motivation." ECF No. 56 at 6-7. They do no such thing. Of the more than thirty searches catalogued in the PSR, not one refers to the Department of Government Efficiency, to any government policy, program, or official, or to Elon Musk; the only references to government agencies are questions about whether the FBI or police could trace him. PSR ¶ 15. They fall into three groups. The first consists of searches about the earlier Tesla attacks ("Tesla Oregon attack," "Salem tesla arson," "Tesla las vegas"), which confirm that Mr. Kim was imitating what he had seen in the news. The second, and largest, consists of searches about how to avoid detection (surveillance cameras, cell phone location, DNA, fingerprints, deleting browser history, "people who escaped the fbi"), which confirm Mr. Kim's intent to avoid being identified, not to deliver a message to anyone. The third consists of ordinary political curiosity ("What do you think about aoc leftists," "Democratic socialists vs social democrats," "Extremists") of the sort millions of Americans type every day.[6]

The government also highlights searches for "killing coworkers" and "how to kill someone." ECF No. 56 at 4. Mr. Kim does not minimize how troubling those searches look. But whatever they reflect about a depressed and isolated man's state of mind, they have nothing to do with government, and nothing in the record connects them to any plan to harm anyone. Mr. Kim deliberately chose a time when no one would be present, and Dr. Paglini’s forensic risk assessment

[6]The government's memorandum omits several of the searches catalogued in the PSR that confirm the copycat character of the offense and the absence of any government-directed purpose, including "Tesla Oregon attack" and "Salem tesla arson," alongside generic political queries such as "What do you think about aoc leftists" and "Democratic socialists vs social democrats." PSR ¶ 15.

found no current violent ideation or intent. Ex. A at 8, 10. These searches do not supply the missing proof that the offense was calculated to influence government.

**5. The government's Musk-DOGE theory is too attenuated to satisfy the statute**

The government's real theory is that because Mr. Musk was both Tesla's chief executive and, during the relevant period, a special government employee associated with the Department of Government Efficiency, an attack on Tesla vehicles was necessarily an attack on government. ECF No. 56 at 3, 6-7. That theory fails at every step.

*First*, Tesla is a publicly traded private corporation, and the damaged cars belonged to private citizens. Mr. Musk's corporate role is not a government role. If the private business interests of anyone who holds a government position were treated as proxies for "government," then vandalism of any business owned by any official, or any company whose founder advises an administration, could become a "federal crime of terrorism." Nothing in § 2332b(g)(5)(A) supports so boundless a reading.

*Second*, the government has not identified any "government conduct" that the offense was calculated to influence or retaliate against. The retaliation prong requires evidence that the defendant "intended to respond to specific government action." *Alhaggagi*, 978 F.3d at 703. The government points to no DOGE decision, no agency action, no policy, and no official act that Mr. Kim sought to change or punish. His family confirms that he never even talked about Mr. Musk. Ex. A at 7. The event Mr. Kim himself identified as the one that pushed him to act was Mr. Musk's gesture at an inauguration-day rally, a personal expressive act at a celebratory event, not an exercise of governmental authority. *Id.* at 8, 12. Mr. Kim's stated aims, to "send a message" to Mr. Musk and "to make others aware" of a danger he perceived, were aimed at a private individual and at the public. *Id.* An intent to express outrage at a private person or to alert the public is precisely

the civilian-directed motive that Congress omitted from § 2332b(g)(5)(A) and that the Commission, for twenty-three years, expressly placed outside § 3A1.4.[7]

*Third*, general dismay with the direction of the country, which Mr. Kim shared with millions of Americans, Ex. A at 12, is political motive. It is not a calculated plan to coerce government. The statute asks what the offense was designed to accomplish, not what political views the offender held. *Awan*, 607 F.3d at 317. The record reflects a socially isolated man with a long history of depression and mood instability who, during an intensely polarized period, imitated a wave of attacks he saw in the news and struck at a symbol. That is serious criminal conduct, and it is punished severely by the five-year mandatory minimum and the offense-level calculation the PSR applies. It is not the specific-intent crime of terrorism that § 3A1.4 addresses.[8]

**6. Planning is not the same as a government-directed purpose**

The government emphasizes that Mr. Kim acted "after long contemplation and considerable preparation." ECF No. 56 at 4. Mr. Kim does not dispute that he planned the offense; he purchased the firearm on March 6, 2025, prepared the incendiary devices, and mapped an escape route. PSR ¶¶ 8, 14. But "calculated" in § 2332b(g)(5)(A) refers to the *object* of the planning, not the fact of planning. *Awan*, 607 F.3d at 317; *Stewart*, 590 F.3d at 137-38. Every premeditated arson

---

[7]The government's memorandum also attributes the attack to Mr. Kim's desire to "capture public attention." ECF No. 56 at 7. Seeking public attention is, by definition, directed at the public. It is the "civilian population" objective that Congress omitted from § 2332b(g)(5)(A) and that the Commission for twenty-three years treated as outside the adjustment.

[8]Mr. Kim has been diagnosed by the defense evaluator with Bipolar II disorder, and the Nevada Southern Detention Center's own records reflect "bipolar affective" disorder and a "manic episode" as active problems, for which he is prescribed oxcarbazepine. PSR ¶ 84; Ex. A at 13. Mr. Kim does not offer his diagnosis as an excuse. It is, however, part of the context in which the Court should assess whether this offense reflected a coolly "calculated" plan to coerce government, as opposed to the despairing, imitative act of a socially isolated man who, in his own words, felt "like the world was ending."

is planned. What distinguishes a federal crime of terrorism is that the planning is directed toward coercing or retaliating against government. That is what is missing here.

**D. The Probation Office's Considered Judgment and the Treatment of Comparable Cases Confirm That the Adjustment Should Not Apply**

The Probation Office, the Court's neutral arm, reviewed the same offense conduct, the same search history, the same "RESIST" graffiti, and the same social-media associations, and declined to apply § 3A1.4. PSR ¶¶ 9, 15, 30, 36, 42. That judgment deserves weight.

It is also consistent with how the adjustment has been handled in comparable cases nationwide. The Department of Justice publicly characterized the 2025 Tesla incidents as a "wave of domestic terrorism."[9] Yet in the one Tesla-related arson sentencing Mr. Kim has located, *United States v. Moses*, No. CR25-0657-PHX-DJH (D. Ariz.), the defendant, who poured gasoline on fire-starter logs against a Tesla dealership and three vehicles, destroyed a Cybertruck, and spray-painted the building, received the 60-month mandatory minimum in January 2026, even as the United States Attorney described the offense as one of the "politically fueled attacks" on Arizona businesses. The public record does not reflect that the terrorism adjustment was applied in that case. Likewise, in *United States v. Rahman*, 1:20-CR-00203-BMC (E.D.N.Y.), where the defendant threw a Molotov cocktail into a New York Police Department vehicle during the 2020 protests, an attack on actual *government* property, the government initially sought the terrorism enhancement but ultimately agreed to a plea to a conspiracy count and recommended a sentence

[9]The Department of Justice announced Mr. Kim's arrest by describing the Tesla incidents as a "wave of domestic terrorism." Press Release, U.S. Dep't of Justice, *Nevada Resident Arrested and Charged in Connection with Violent Tesla Arson in Las Vegas* (Mar. 27, 2025). Public characterizations of that kind are not evidence, and they are not the legal standard. The statutory definition of "domestic terrorism" in 18 U.S.C. § 2331(5) expressly reaches acts intended "to intimidate or coerce a civilian population"; § 2332b(g)(5)(A), which alone governs § 3A1.4, does not.

of 18 to 24 months; the court imposed 15 months, and the co-defendant received a year and a day. If the adjustment was not pressed where the property destroyed belonged to the police, it should not be imposed where the property belonged to private car owners.

**IV. EVEN IF THE COURT FOUND THE ADJUSTMENT TECHNICALLY APPLICABLE, A SUBSTANTIAL VARIANCE WOULD BE REQUIRED**

Should the Court conclude that § 3A1.4 applies, Mr. Kim respectfully submits that the resulting range would so dramatically overstate the seriousness of the offense and his culpability and risk that the Court should vary to the sentence he requests. The Guidelines are advisory, and the Court must make an individualized assessment under § 3553(a). *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). The en banc Ninth Circuit has specifically directed that concerns about enhancements with extraordinary effects on the sentence be addressed through that reasonableness framework. *Lucas*, 101 F.4th 1158.

*First*, § 3A1.4(b)'s automatic assignment of Criminal History Category VI is a legal fiction when applied to Mr. Kim. He has zero criminal history points. PSR ¶ 57. Category VI is ordinarily reserved for defendants with thirteen or more points, typically those with long records of serious offenses. Even courts that have upheld § 3A1.4(b) against challenge have recognized that where Category VI over-represents the defendant's actual criminal history or likelihood of recidivism, the sentencing court retains discretion to impose a lower sentence. *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). Here, the forensic evidence is uncontroverted: on validated instruments, Mr. Kim produced normal personality profiles with low aggression scores and no antisocial traits, and the HCR-20 structured risk assessment places him at low risk of violent or criminal reoffense. Ex. A at 9-12.

*Second*, district courts may vary based on a reasoned policy disagreement with a guideline, including one promulgated in response to a congressional directive rather than empirical study. *Kimbrough v. United States*, 552 U.S. 85, 101-02, 109-10 (2007); *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011). Section 3A1.4 took its current form in response to a congressional directive in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, not as a product of the Commission's empirical study of past sentencing practice. A mechanical twelve-level increase combined with a six-category criminal history leap, applied to a property offense with no injuries by a first offender, produces a range untethered from any empirical measure of culpability or risk.

*Third*, the magnitude of the government's proposed increase is itself a reason for caution. The government would move the bottom of the range from 60 months to 210 months, an increase of 150 months, on the strength of an inference about Mr. Kim's subjective purpose drawn from a single word of graffiti and a set of internet searches that never mention government. Even if the Court found that inference marginally more likely than not, it could not responsibly treat it as warranting the equivalent of more than twelve additional years in prison.

*Fourth*, and for the same reasons, the Court should decline any suggestion that it reach a similar result indirectly, through an upward variance premised on the civilian-directed motive addressed by former Application Note 4. The offense-level calculation in the PSR already accounts for the dangerousness of the conduct, the number of incendiary devices, and their use in connection with the arson. PSR ¶¶ 26-29, 34, 40. And the experience of the cases discussed above shows that even when courts have made such an adjustment for politically motivated arson of private property, the resulting sentences have remained a fraction of what the government seeks here. In *Tankersley*,

for example, the sentence after departure was 41 months for an arson causing nearly $1 million in damage.

## V. THE § 3553(a) FACTORS SUPPORT A SENTENCE OF 60 MONTHS

The Court's overarching duty is to impose a sentence "sufficient, but not greater than necessary," to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). Those purposes are fully served by the 60-month sentence the Probation Office recommends.

### A. The Nature and Circumstances of the Offense

Mr. Kim's offense was serious and dangerous, and he does not contend otherwise. He used a firearm and incendiary devices; fire spread to adjacent vehicles; and although he chose the middle of the night so that no one would be hurt, the fire posed risks to the neighborhood and to the first responders who extinguished it. Those facts are why Congress set a five-year mandatory minimum for § 844(i) and why the PSR applies the higher base offense level for offenses creating a substantial risk of serious bodily injury. PSR ¶¶ 34, 40.[10] At the same time, the offense was a single episode lasting minutes; it caused property damage only; no person was injured; and the vehicle owners have been compensated by insurance. PSR ¶ 21; PSR at 24. The mandatory minimum fully reflects the seriousness of this offense.

### B. Mr. Kim's History and Characteristics

Before this offense, Mr. Kim lived a law-abiding life for 36 years. PSR ¶¶ 55-60. He worked steadily, including in demanding freelance production work. PSR ¶¶ 94-97. He carries the

---

[10]The government's recommendation also relies on the danger posed to firefighters by lithium-ion battery fires. ECF No. 56 at 10-11. Mr. Kim does not minimize that risk. But it is already fully accounted for in the offense level: the PSR assigns base offense level 20 under § 2K1.4(a)(2) precisely because the offense "created a substantial risk of death or serious bodily injury to any person other than a participant." PSR ¶¶ 34, 40. Counting it again to justify a 240-month sentence would double-count the same harm.

weight of lifelong developmental, social, and mental-health challenges: early hyperactivity and an incomplete autism evaluation, ADHD, childhood bullying and a harsh father, chronic depression with a near-suicide in 2017, and what has now been diagnosed as Bipolar II disorder with schizoid personality traits. PSR ¶¶ 64, 71-72, 78, 81-88; Ex. A at 3-6, 13. His isolation was profound: in more than a decade in Las Vegas, he made no friends. Ex. A at 6. That isolation matters, because it left him alone with the news and social media during a period of intense national polarization, with no one to talk him out of a terrible idea. As his brother put it: "I wish he would've discussed it with me." *Id.* at 7.

Mr. Kim's psychological testing is striking in what it does *not* show. Both the MMPI-3 and the PAI produced valid protocols with no elevations for psychosis, antisocial personality, or aggression; his aggression score was approximately one standard deviation *below* the mean, and his profile is that of a shy, passive, submissive person. Ex. A at 9-10. Dr. Paglini concluded that Mr. Kim "has led a nonviolent life," shows no antisocial personality disorder or sociopathy, and is at low risk to reoffend. *Id.* at 12.

**C. Acceptance of Responsibility and Remorse**

Mr. Kim pleaded guilty to every count of the Indictment, without a plea agreement and without any promise from the government. PSR ¶ 3. He has expressed remorse for the harm he caused the vehicle owners, his family, and everyone else affected. Ex. A at 8, 12. Dr. Paglini found that remorse to be genuine. *Id.* at 12. Mr. Kim will address the Court directly at sentencing.

**D. Deterrence and Protection of the Public**

A 60-month sentence, served by a man who had never before spent a day in jail, is a severe punishment that provides ample specific and general deterrence. The Department of Justice's own research arm has concluded that the certainty of being caught, rather than the severity of

punishment, is the more powerful deterrent. Nat'l Inst. of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* (2016). Here the certainty of serious punishment is absolute: every person who commits an arson like this one faces a mandatory five years in federal prison. The public will be further protected by three years of supervised release with the conditions the Probation Office recommends, including mental-health treatment, a prohibition on possessing firearms or destructive devices, a prohibition on entering Tesla facilities without permission, and a search condition. PSR at 24-27. Mr. Kim will live with his family in Washington, who are committed to supporting him. PSR ¶¶ 76, 88; Ex. A at 11.

**E. Need for Treatment**

Mr. Kim needs continued psychiatric medication management and therapy for his mood disorder and depression. Ex. A at 13; PSR at 24. He has responded well to treatment in the past and is currently stabilized on medication. PSR ¶ 82; Ex. A at 5, 10. A sentence of 60 months provides ample time for the Bureau of Prisons to deliver that treatment, which can be continued in the community on supervision.

**F. The Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) directs the Court to avoid unwarranted disparities among similarly situated defendants. According to the Commission's Judiciary Sentencing Information data, the median sentence imposed on defendants sentenced under § 2K1.4 with a final offense level of 25 and Criminal History Category I during fiscal years 2021 through 2025 was 71 months. PSR at 23. By contrast, the government concedes that there is not even a sufficient sample of § 2K1.4 defendants at its proposed offense level 32 and Category VI to generate data. ECF No. 56 at 10. That rarity is not, as the government suggests, a reason for severity; it is confirmation that the

government is asking the Court to place Mr. Kim in a category occupied by virtually no one sentenced for comparable conduct.

Sentences imposed on other defendants for politically motivated arson, including arsons of actual government property and arsons endangering occupied homes, confirm that 60 months is in line with national practice, and that 240 months would be a stark outlier:[11]

| **Case** | **Conduct** | **Sentence** |
|---|---|---|
| *United States v. Moses* (D. Ariz. 2026) | Gasoline arson of Tesla dealership and vehicles; Cybertruck destroyed; building spray-painted; described by U.S. Attorney as a "politically fueled" attack | 60 months |
| *United States v. Channon* (W.D. Wash. 2022) | Set fire to five Seattle Police Department vehicles during a 2020 protest, with crowds nearby | 60 months |
| *United States v. Robinson*; *Wolfe*; *Turner* (D. Minn. 2021) | Conspiracy to commit arson of the Minneapolis Police Department's Third Precinct building; $12 million restitution | 48, 41, and 36 months |

[11]Sources: Press Release, U.S. Att'y's Off., D. Ariz., *Mesa Man Sentenced to 5 Years in Prison for Setting Fire to Tesla Dealership* (Jan. 2026) (*United States v. Moses*, No. CR25-0657-PHX-DJH); Press Release, U.S. Att'y's Off., W.D. Wash., *Tacoma Woman Sentenced to 5 Years for Burning Police Cars at Downtown Seattle Protest* (Mar. 2022); Press Releases, U.S. Att'y's Off., D. Minn. (Apr.-May 2021) (Third Precinct defendants); Press Release, U.S. Att'y's Off., S.D. Cal., *San Diego Man Sentenced to Seven Years for Politically Motivated Arsons* (Nov. 5, 2019) (*United States v. Mackinnon*, No. 19CR1849-WQH); Brief for the United States in Opposition, *Tankersley v. United States*, No. 08-1104 (U.S. 2009); *United States v. Rahman* (E.D.N.Y.) (sentencing of Nov. 18, 2022).

| Case | Conduct | Sentence |
|---|---|---|
| *United States v. Rahman* (E.D.N.Y. 2022) | Molotov cocktail thrown into NYPD vehicle during 2020 protest; government initially sought terrorism enhancement | 15 months |
| *United States v. Tankersley* (D. Or. 2007), *aff'd*, 537 F.3d 1100 (9th Cir. 2008) | ELF arson of private timber company headquarters; approx. $990,000 loss; § 3A1.4 found inapplicable | 41 months |
| *United States v. Mackinnon* (S.D. Cal. 2019) | Politically motivated arsons of an occupied family home (three children asleep inside) and a defense-contractor facility | 84 months |

Measured against these cases, many of which involved government targets, occupied dwellings, or crowds, the government's request for 240 months for an arson of private vehicles at an empty business at 2:30 a.m. cannot be reconciled with § 3553(a)(6). The 60-month sentence recommended by the Probation Office can.

**G. Restitution**

Restitution is mandatory under 18 U.S.C. § 3663A, and Mr. Kim does not dispute his obligation to pay it in the amount the Court determines is supported by the record. He has no ability to pay a fine, and both the Probation Office and the government agree that no fine should be imposed. PSR ¶ 102; PSR at 23-24; ECF No. 56 at 1.

## VI. REQUESTED SENTENCE

Mr. Kim respectfully requests that the Court:

1. Overrule the government's objection to the PSR and decline to apply U.S.S.G. § 3A1.4;

2. Adopt the PSR's calculation of a total offense level of 25, Criminal History Category I, and an advisory range of 60 to 71 months;

3. Impose a sentence of 60 months' imprisonment on each of Counts 1, 2, and 3, and 60 months on Count 4, all to run concurrently;

4. Impose three years of supervised release on each count, concurrent, with the conditions recommended by the Probation Office, including mental-health treatment;

5. Impose no fine, the mandatory $400 special assessment, and restitution in an amount determined by the Court;

6. Recommend that the Bureau of Prisons designate Mr. Kim to a facility as close as possible to his family in the Seattle, Washington area, such as FCI Sheridan, and that he receive mental-health evaluation, medication management, and treatment while in custody; and

7. In the alternative, should the Court find § 3A1.4 applicable, vary downward to a sentence of 60 months for the reasons stated in Parts IV and V.

## VII. CONCLUSION

Paul Kim did something terrible, and he will be punished for it with at least five years in federal prison, followed by supervision and a substantial restitution obligation. What he did was not, under the statute Congress wrote, a federal crime of terrorism. His targets were private cars owned by private people; he made no demand of any government, sent no message to any official, and sought to change no government act. The Probation Office correctly declined to apply § 3A1.4,

and the Court should do the same. A sentence of 60 months is sufficient, but not greater than necessary, to serve the purposes of sentencing.

DATED this 6th day of October, 2026.

Respectfully submitted,

*/s/ Michael L. Becker*
MICHAEL L. BECKER, ESQ.

*/s/Adam M. Solinger*
ADAM M. SOLINGER, ESQ.
Attorneys for Defendant Paul Hyon Kim

# Exhibit "A"

— Psychological Evaluation of Paul Kim by John Paglini, Psy.D.

*John Paglini, Psy.D.*
**Licensed Psychologist**
**9163 West Flamingo, Suite 120**
**Las Vegas, Nevada 89147**
**Phone: (702) 869-9188** **Fax: (702) 869-9203**

July 17, 2026

PSYCHOLOGICAL EVALUATION

DEFENDANT'S NAME: Paul Kim
CASE NUMBER: 0978 2:25CR00093-001
DATE OF BIRTH: September 6, 1988
AGE: 37 years
SEX: Male
REFERRAL SOURCE: Attorney Adam Solinger
EVALUATOR: John Paglini, Psy.D.

REASON FOR REFERRAL

Attorney Adam Solinger requested a psychological/mitigation evaluation of his client, Mr. Paul Kim.

PROCEDURES OF EVALUATION

1. Interview of Mr. Paul Kim at the Nevada Southern Detention Center, June 16, 2026, June 26, 2026, and July 3, 2026.
2. Telephonic interview of Mr. Phil Kim, younger brother of Mr. Paul Kim, July 2, 2026.
3. Administration of psychological testing, June 16, 2026:
   - Minnesota Multiphasic Personality Inventory – 3 (MMPI-3)
   - Personality Assessment Inventory (PAI)
4. Review of discovery provided by Attorney Adam Solinger:
   - United States of America vs. Paul Hyon Kim, Presentence Investigation Report, filed April 21, 2026.

CRIMINAL CHARGES

Mr. Paul Kim was charged with two counts of arson of property used in interstate commerce, a Class C felony; one count of attempt arson of property used in interstate commerce, a Class C felony; one count of possession of an unregistered firearm, a Class C felony, for events that allegedly occurred on or about March 18, 2025. According to the Presentence Investigation Report, it is alleged that on March 18, 2025, Las Vegas Metropolitan Police Department dispatch received multiple 911 calls regarding a suspect, later identified as Mr. Kim, who had intentionally set on fire and discharged a firearm at a Tesla Collision Center in Las Vegas, Nevada. A witness reported Mr. Kim had spray painted "RESIST" on the front door of the Tesla Collision Center. During the investigation, it was discovered that Mr. Kim had discharged a firearm into several Tesla vehicles several times and successfully set two Tesla vehicles on fire with Molotov cocktails. He attempted to set a third vehicle on fire but was unsuccessful; it appeared the driver's side window had been shot. A fourth and fifth vehicle received collateral damage from the fires. It is noted, "LVMPD investigators noted that several similar incidents had

occurred nationwide a few months earlier, which involved Tesla vehicles and dealerships being vandalized. Those incidents included individuals who intentionally set Tesla vehicles on fire, in protest against Tesla owner, Elon Musk. The protesting reportedly stemmed from apparent disagreements of political ideology or views."

INFORMED CONSENT

Mr. Kim was advised that this is an attorney-ordered psychological evaluation. Mr. Kim was advised that currently information provided is protected by attorney/client privilege. If his attorney elects, this report may be submitted to the presiding judge. If this is the case, information is no longer confidential. Mr. Kim signed a consent form regarding the above.

## MENTAL STATUS EXAM/BEHAVIORAL OBSERVATIONS

Mr. Paul Kim is a single 37-year-old Korean-American male who was dressed in detention center clothing with adequate hygiene. His hair and beard were long. He was alert and oriented to the current date, day of the week, president, and city and state. Mr. Kim denied current suicidal/homicidal ideation, intent or plan. Mr. Kim's speech quantity/speech quality were well within normal limits with no speech impairment. His mood appeared neutral with a restricted range of affect. Mr. Kim appeared reserved and reticent. Mr. Kim's thought processes were logical and goal-oriented and his thought content was appropriate issues discussed. Mr. Kim appeared cooperative and polite throughout the evaluation.

## PSYCHOSOCIAL HISTORY

FAMILY OF ORIGIN HISTORY:

Mr. Kim was born on September 6, 1988, in Namwon, South Korea, where he resided for the first two weeks of his life. He was born to Mr. John Kim and Ms. Seung Joo Kim. Mr. Kim is the oldest of a siblingship of three. His parents have been married for 40 plus years, and his father is 10 years senior to his mother.

Mr. Kim reported that his family moved from Namwon, South Korea, when he was two weeks of age and immigrated to the United States. The family resided in Bremerton, Washington, from his age of two weeks to five or six years. He and his family then resided in Monroe, Washington, from his age of five or six to ten. He and his family then resided in Bellevue, Washington, from his age of ten to approximately 23 or 24.

Mr. Kim reported his father initially worked at a convenience store at a gas station and later owned his own Travel Lodge Motel. Mr. Kim reported his father is 75 and continues to run his Travel Lodge Motel. Mr. Kim reported his mother was primarily a housewife but also briefly sold cosmetics. His mother currently is retired. Mr. Kim stated his family was working class, then middle class, and now upper-middle class.

Mr. Kim's younger brother, Phillip, age 36, works at his father's Travel Lodge Motel. His sister, Julie, age 34, works for a video game company. None of his siblings are married, nor do they have substance abuse or criminal issues. He reported his sister has a history of chronic depression.

Mr. Kim reported he always had a positive relationship with his mother. He described his father as physically abusive during his childhood as he was hit with chopsticks or a spoon several times on the hand. He denied CPS was ever called his home, nor did he have any bruises. Currently, Mr. Kim reported an improved relationship with his father.

Mr. Kim denied sexual traumas. He reported he was frequently bullied from third to fifth grade as he is Asian and resided in a primarily Caucasian area. He was called racist names, and he was involved in five fights from third to fourth grade that were initiated by other individuals. He reported by fifth grade the bullying lessened and stopped by middle school.

Regarding the positives of his childhood, he recalled during the summers he had a lot of friends and played outside. The negatives of his childhood included being bullied and his father's discipline. He acknowledged his father provided for the family and his parents were invested in he and his siblings' welfare.

Mr. Kim denied exposure to domestic violence, nor did his parents have drug or alcohol problems. He reported during his adolescence he was involved in taekwondo, kendo, and wrestling. His adolescent interests included video games on the Xbox and GameCube.

Mr. Kim described himself as shy and a loner. He stated that his parents were somewhat demanding from elementary through high school as they wanted him to attain perfect grades and perfect SAT scores. He reported he never met their expectations. From the age of 13 to 19, he stated he was very shy, he did not date in high school, and his friends were because of his brother who was more social.

<u>EDUCATIONAL HISTORY:</u>
Mr. Kim denied grade repeats. He reported his family primarily spoke Korean when he was younger, and during elementary school he was in ESL classes for one year. He reported an A/B average in elementary school. He was diagnosed with ADHD and placed on medication during this time frame. In middle school, he reported his grades varied from As to Ds. He denied any behavioral problems at school. Mr. Kim attended one high school, he struggled in math and earned a 2.8 GPA. He was involved in wrestling for one year and denied any history of behavioral problems. Mr. Kim graduated high school in 2007.

Mr. Kim attended Central Washington University for four years. His grades varied from As to Bs. He attempted to major in video studies. He reported he was one credit shy. During this timeframe, he was employed in an internship program at a company. He decided not to complete the credit and therefore he does not have a bachelor's degree. Mr. Kim has no further education.

<u>EMPLOYMENT HISTORY:</u>
Mr. Kim reported from the age of 18 to 21 during summers between college years, he worked at his father's motel at the front desk. He did not work during the college school year. During his senior year he had an internship at a TV studio. After the internship, he worked that same job for the next two years as a transcriber. He reported he transcribed the footage from the TV studio regarding the day. He worked for a Screaming Flea Productions. He quit as he wanted a better job. He moved to Los Angeles, California, and struggled to obtain work from studios. He was

intermittently employed in productions or independent films, but his work was unstable. Sometimes he worked from one to five days. He was mainly unemployed. His goal at this time was to be employed as a freelancer in film and TV, such as a production assistant and his ultimate goal was to work in the camera department.

After a year of residing in Los Angeles, Mr. Kim moved to Las Vegas, Nevada. He worked for a few months as a waiter at Kabuki restaurant. He then worked at Manpower in temporary positions for one year. From 2016 to 2019, he again worked at Kabuki as a server.

After being depressed with a suicidal gesture, Mr. Kim decided to become a freelancer in film and TV in Las Vegas, Nevada. Sometimes, within a month, he worked 20 days. At other times, he found it difficult to remain employed. He worked at this job from 2019 until his arrest in 2025. He estimated he earned approximately $30,000 to $40,000 per year. Mr. Kim denied ever being placed on Social Security Disability.

MEDICAL HISTORY:
Mr. Kim reported he was born healthy and attained developmental milestones within normal limits. He denied a history of surgeries or traumatic brain injuries. He described himself as healthy. He currently is on a mood stabilizer.

PSYCHOLOGICAL HISTORY:
Mr. Kim denied prior psychiatric hospitalizations or psychiatric legal holds. He reported he was on ADHD medications, primarily Concerta, from the age of 17 to 19, as prescribed by a psychiatrist.

Mr. Kim reported his depression began in middle school as “life was not great and I felt hopeless.” He stated he has always been a quiet reserved person, and he described his personality as shy. He never had any significant friends and his only friends were through his brother, Phillip, who was much more social. During high school, he reported he was afflicted with intermittent depression. Throughout college, he reported he was not depressed as he resided on campus and felt somewhat more hopeful. He stated that he enjoyed college. From his age of 22 to 25, he reported he continued to do well and he described generally a good mood.

Mr. Kim stated in 2017 he was very depressed as he felt directionless with no path in life. During this time, he worked as a server in a restaurant while he desired to be employed in the TV/movie industry. On one occasion, he put a gun to his head. He did not go through with the suicide as he thought about the subsequent heartache for his family. He did not seek help, nor was he psychiatrically hospitalized. When asked how he moved forward in his life, he reported he no longer wanted to be a food server, and he was determined to go into the movie/TV business, which gave him purpose/hope.

In 2018, he reported his mood improved. He was able to consistently work in TV, film, and sometimes he still worked at the restaurant. He denied any significant depression. In 2019, he continued to work freelance full-time, and for the most part he was stable. In 2020, he again became depressed, and for a short period of time, he consumed high quantities of alcohol. His brother requested that he seek therapy. Mr. Kim was in therapy for six months and he stabilized.

By late 2021, his work increased, and he was more stable. He described the timeframe from 2021 to 2023 as primarily stable as he was not depressed.

Mr. Kim reported he again was in therapy in 2024. He stated he was depressed for one year and believed he had a bipolar disorder, as he had mood swings, interrupted sleep, and hyperverbal speech/thought racing. During a collateral interview, Mr. Kim's brother, Mr. Phil Kim, noted that Paul exhibited mood swings. He reported he was manic for a week which was followed by a depressive episode. Mr. Kim reported he thought he had a bipolar condition, but his psychologist did not believe he had a bipolar condition. Mr. Kim reported that he worked out at the gym to work off his energy. He stated after the manic episode he was depressed but not suicidal. He was not on medication during that time. From January to March 2025, he reported his mood was stable. He was neither manic or depressed. Currently, Mr. Kim reported he has been on Oxocarbenium for mood disorder for five months while incarcerated. He stated this medication has helped with his mood swings. Mr. Kim denied psychosis, adult traumas and related issues. Additionally, he denied anger-related issues.

SUBSTANCE USE HISTORY:

Mr. Kim reported he smoked marijuana from 2020 to 2021, initially a few times a week to eventually daily for three months. From 2022 until his arrest in late March 2025, he reported he smoked marijuana approximately once per month. Mr. Kim denied all other drug use as well as gambling-related issues.

Mr. Kim reported he began to consume alcohol once a week, normally one to two beers, at his age of 21. During COVID, at his age of 32, he consumed alcohol daily for one week, which included a few beers, a full bottle of wine, and some shots of vodka. He advised his brother of the above, and his brother encouraged him to go into therapy. From that point on, he described his alcohol consumption as social, which was once every three months, only a few beers. He denied alcohol-related issues. He has never been in a substance abuse treatment center. Additionally, he denied alcohol was involved in this crime.

CRIMINAL HISTORY:

Mr. Kim reported as a juvenile, he was never involved in any gangs nor did he ever initiate fights. He did not engage in stealing, carrying weapons, runaways, graffiti, selling drugs, pimping, break-ins, violent offenses or sex offenses. Mr. Kim was never arrested or cited for a criminal offense as a juvenile.

Previous to Mr. Kim's current arrest, he was never cited or arrested for a crime. Mr. Kim reported he was arrested on March 26, 2025, for the current index offense. He has been incarcerated at the Nevada Southern Detention Center since March 26, 2025. Regarding his functioning at jail, he reported that he has had no fights nor write-ups. He has not been in isolation or protective custody. He currently is housed in a dorm. He reported detention was a very difficult adjustment, but he has improved.

RECORD REVIEW:

A Presentence Investigation Report of Mr. Paul Kim was reviewed. On page 12-13 of this report, it is noted that Mr. Kim has no juvenile adjudications. From 2016 to 2023 in Clark County

Nevada, Mr. Kim was convicted of resident with non-Nevada drivers license and basic speeding violation. "No criminal history points were assessed." His first offense is the current criminal incident from March 26, 2025.

RELATIONSHIP HISTORY:

Mr. Kim reported he is single and he does not have any children. He reported throughout his life he has rarely dated. He described himself as heterosexual. He does not have male or female friends as he described himself as a loner. He has never been in a significant relationship.

Mr. Kim reported that he resided with his parents until his age of 18. During college, he resided in the dorms for all four years and with his parents during the summer. He reported during his first two years, he rarely socialized. During his last two years, he was slightly more social as he was involved in a club. He then resided in Los Angeles, California, in an Airbnb with strangers as he attempted to work in the film industry. He was there for approximately a year. His plans did not work out and he moved to Las Vegas, Nevada in 2013. He initially resided with his brother's friend, Bernard, for four or five years in an apartment. He resided alone in his own apartment from 2019 until his arrest on March 26, 2025. Mr. Kim reported during his several years in Las Vegas, Nevada, he does not have any friends.

COLLATERAL INTERVIEW

I. Mr. Phil Kim:

Mr. Phil Kim was telephonically interviewed on July 2, 2026. Mr. Phil Kim is the younger brother of Mr. Paul Kim. Occasionally in the background was Paul's and Phil's mother providing information to Mr. Phil Kim. Mr. Phil Kim reported at an early age, Paul was taken to California for an autism assessment.

Mr. Phil Kim was asked about his comment regarding autism. Mr. Kim's mother advised Mr. Phil Kim that she took Paul to Diamond Bar, California, for assessment when he was in fourth grade. She was advised that "he is cross-dominant autistic." When asked what cross dominant meant, he did not know. He stated later his brother was diagnosed with ADHD and was on psych meds.

I reviewed some of the criteria for autism and it did not seem that Mr. Paul Kim met that diagnosis. His mother reported that he is a very disengaged individual and that at times, he had a difficult time reading social cues. When he was on medication for the ADHD, he appeared to have improved.

Regarding how Mr. Paul Kim performed in school, "not very well, he struggled with concentration. He then was placed on ADHD meds in high school." Mr. Phil Kim reported his brother, Paul, attended Central Washington University and his grades improved whereby he was on the Dean's List for all four years. His brother did not receive a bachelor's degree as he was one credit shy, he was in an internship and never returned.

Mr. Phil Kim reported Paul was employed at "The Screaming Flea" Productions. Paul had that job for a few years. Paul then moved to Los Angeles to try to break into the movie film industry but was unsuccessful. Paul then moved to Las Vegas, Nevada.

Mr. Phil Kim reported his brother told him while he resided in Las Vegas, Nevada, that he was suicidal. He helped his brother cope with his depression. He believes a few years later during the pandemic (2020), his brother began therapy. During Covid, his brother struggled with coping and was depressed. Therapy helped him deal with his childhood trauma. Regarding childhood trauma, Mr. Phil Kim reported Korean fathers are hard on their sons and try to make them psychologically resilient/physically tough. Koreans can be more physical to develop mental toughness. He stated that this does not work for every child, especially that Paul had autism. He reported Paul had a lot of depression and insecurities and he as a brother tried to help Paul out.

Regarding substance abuse, Mr. Phil Kim denied his brother exhibits any substance-related issues with the exception of occasionally smoking marijuana. Mr. Phil Kim reported his brother has never been arrested as a juvenile or adult nor has he displayed any violence towards family or friends. His brother has no history of anger control issues nor animal abuse.

Mr. Phil Kim describes his brother as a long time liberal. Mr. Kim reported that Paul never talked about Elon Musk. Mr. Phil Kim reported his brother's committing the crime was a shock to him and his family. He stated that although his brother had certain views of the United States, it was never to an extreme. He believes this crime occurred because his brother acted as a copycat. He stated his brother was never violent, rather he was on a few peaceful marches in the past. His brother never discussed violence.

Mr. Phil Kim reported that his brother had weapons but so does he and his family. Their father was in the Southern Korean Military, and the family owns weapons and knows gun safety. His brother never espoused violent rhetoric towards President Trump, Mr. Musk or the Republican Party. He stated his brother's leaning is more socialistic which means that his brother believed in free health care, fair wages, and free social programs to help the homeless with housing. As noted, Mr. Phil Kim reported his brother has never displayed any violent rhetoric towards anyone nor has he acted violently in the past. Regarding why his brother engaged in the criminal act, "I believe he was influenced by social media. He would not do this. He saw the patterns. I wish he would've discussed it with me."

Mr. Kim reported his brother can at times be very sad and depressed or really happy. I explored with him his brother's moods. He stated at times his brother can be upbeat and energetic and somewhat impulsive. He denied his brother's thoughts raced. Mr. Phil Kim acknowledged that his brother lives in a different state and it was hard to keep track of his moods.

## DEFENDANT'S VERSION OF CRIME

Mr. Kim described his beliefs similar to a Democrat socialist. He believes the government should help the impoverished and working class. He believes there should be free health care and free education. Regarding how he responded when Donald Trump became the president in 2016, he reported it was not great, but life moved on. Regarding the Joe Biden administration, he stated his life continued and it was okay. Right before the Biden administration, on January 6, 2021, when some U.S. citizens invaded the Capitol, he reported it was shocking to see Americans engage in that behavior.

Mr. Kim reported that he did not vote for Donald Trump nor Kamala Harris. He preferred Jill Stein as opposed to any other candidate and he decided not to vote. Regarding Trump being reelected, he reported it was disappointing to see the United States go into a negative direction. He believed the country was headed toward a fascist/authoritarian direction. Pertaining to his perceptions of Mr. Elon Musk prior to the election, he stated did not pay attention to Mr. Musk.

After President Trump was sworn in 2025, this is when the president pushed the Department of Government Efficiency (DOGE) to conduct severe cutbacks with the government and there were also polarizing immigration issues. This was a very divisive time frame for the United States. Mr. Kim perceived Mr. Elon Musk as a white supremacist who was now involved in the government. He perceived President Trump and Mr. Musk as working side by side with the ideology of white supremacists/Nazis. Regarding immigration, he stated he was an immigrant and now an American citizen. He felt at times the government unfairly targeted immigrants. He was upset with the country's direction but not obsessed.

When asked what escalated him to the point where eventually he engaged in his criminal acts, he reported it was when Mr. Musk gave the Nazi salute (see Exhibit 1). He perceived the country moving towards a fascist ideology. He felt he had to do something to make others aware of this danger.

Mr. Kim stated that he firebombed two Tesla vehicles and a third firebomb did not go off. He initially shot out the cameras with his gun which he had purchased within the last month or two prior to the crimes. Mr. Kim has owned guns for several years. He tried to break the Tesla car windows to put in the fire bombs, but the windows were not broken by his wrench. He fired at the Tesla windows, and the windows had bullet holes. He then used his wrench to break the windows. He also painted "RESIST" on the Tesla building. When asked why he wrote "RESIST," he stated that at the time he felt like the world was ending and he was trying to take a serious step to stop evil from happening. As such, he wrote "RESIST." He obtained the idea of damaging the Tesla vehicles from listening to the news and seeing that other people engaged in similar behavior across the United States. He reported he was nervous during the commission of the crime and made mistakes. He was apprehended eight days later. He stated his whole point of his behavior was to resist the white supremacist/Nazi ideology taking over the country. Mr. Kim reported that he engaged in the criminal behaviors at approximately 2.30 a.m. He chose that time because he did not want anyone hurt. Although he had a weapon, the goal was to take out the cameras and not hurt anyone. Regarding if he has any remorse for his behavior, he reported that he feels bad for the owners of the cars; they were not specifically targeted, rather, he was trying to send a message to Elon Musk regarding his Nazi salute. He perceived himself resisting the fascist/authoritarian direction of the United States. He stated he had no intent to hurt anyone, and it was merely to send a message about the Nazi salute/fascist beliefs of Elon Musk.

Regarding how he currently perceives his behavior, Mr. Kim reported, "I definitely overreacted. I regret what I did to all the people, for all the pain I caused the owners of the cars, my family, and everyone involved." Mr. Kim added that he is very remorseful and sorry that he inconvenienced the government with his inappropriate actions, "I pulled everyone into my bullshit." The PSI noted on page 5 that Mr. Kim's social media accounts noted that Mr. Kim posted photos of himself shooting firearms and openly discussed his political views. "On Kim's

Instagram account, Kim followed the Socialists Rifle Association (SRA)-Reno Chapter; Antifa United; BLM-Las Vegas; and Communist Party USA. On his Facebook account, Mr. Kim's favorites included Liberals Gun Corner."

On page 6, an investigation of Mr. Kim's Google search history revealed he conducted several searches between February 21, 2025, and March 26, 2025, indicating that the crime was premeditated.

## PSYCHOLOGICAL TESTING

**Minnesota Multiphasic Personality Inventory – 3 (MMPI-3)**

The MMPI-3 is a standardized self-report measure of an individual's personality, psychopathology, and emotional adjustment. The MMPI-3 is designed to be administered to individuals who are 18 years of age and older. It consists of 335 true-false items which comprise several validity scales, clinical scales, and multiple supplementary scales.

The validity and reliability subscales of the MMPI-3 were assessed within normal limits. Mr. Kim produced a valid and reliable protocol.

Analysis of the restructured clinical subscales, higher ordered subscales, somatic/cognitive subscales, internalizing subscales, externalizing subscales, and PSY-5 subscales indicate all were assessed within normal limits. The only elevation he had was on the shyness scale (T-score = 69). Individuals with this elevation endorse that they are shy, easily embarrassed, and uncomfortable around others. These individuals tend to be socially introverted, inhibited, and prone to be somewhat anxious. To conclude, a normal profile was noted. He is free from psychosis, extreme mood disorder, behavioral acting out, anger proneness, aggressiveness, and substance abuse problems.

**Personality Assessment Inventory (PAI)**

The Personality Assessment Inventory (PAI) is a self-report, objective test of personality designed to provide information on client variables. The PAI is designed for the clinical assessment of adult ages 18 and older. The PAI contains 344 items, which comprise 22 scales. Each item is answered with four possible answer choices: false, slightly true, mainly true, and very true. The scales are presented as T-Scores that have a mean of 50 and a standard deviation of 10. The T-score allows comparison of the individual's score to the national standardization sample, and the clinical standardization sample.

The validity and reliability subscales were assessed within normal limits. Mr. Kim produced a valid and reliable protocol. Analysis of the full-scale profile revealed no elevations for psychosis, mood disorders, nor negative personality traits. The antisocial personality subscale had a T-score of 47, assessed within normal limits. The aggression subscale had a T-score of 41, approximately 1 standard deviation below the mean, indicating that he is not an aggressive person. Interesting to note, the suicide subscale had a T-score of 70. This likely noted his prior instances of struggling with depression and a suicide gesture. Although his depression subscale was within normal limits, as noted, he is currently on psychiatric medications.

Interpersonally, Mr. Kim had a very low score on the dominant scale (T-score = 38). Individuals with this score tend to be very submissive and passive regarding interpersonal conflict. Mr. Kim may be described as withdrawn and introverted with little interest in socializing. His personal relationships tend to be passive and disengaged.

RISK ASSESSMENT

**The HCR-20, Third Edition**

The HCR-20, Third Edition is a checklist of risk factors for violent behavior. The HCR-20, Third Edition consists of 20 risk factors organized around ten historical factors, five clinical or present factors, and five risk management factors.

*I. Historical factors*

H1) History of problems with violence: A review of the Presentence Investigation Report indicates that Mr. Kim has no prior criminal history. He has never been in any initiated fights, nor has he had prior arrests for violence.

H2) History of problems with other antisocial behavior: Mr. Kim has no history of problems with other antisocial behavior.

H3) History of problems with relationships: Mr. Kim reported he has never been in a relationship as he is too shy. He only has briefly dated.

H4) History of problems with employment: Mr. Kim was employed as a freelance worker in the TV/movie industry. At times he worked 60 hours a week and 40% of the time he was unemployed. He desired to work consistently and at times he has been somewhat depressed when he has not consistently worked.

H5) History of problems with substance use: Mr. Kim does not exhibit any substance-related problems.

H6) History of problems with major mental disorder: Mr. Kim has struggled with depression to the point when on one occasion he put a gun to his head (2019). Currently, he is on psychiatric medication and he has stabilized.

H7) History of problems with personality disorder: There is no evidence of personality disorder.

H8) History of problems with traumatic experiences: Mr. Kim was bullied and cited some physical abuse by his father. He does not have a significant history of traumatic experiences.

H9) History of problems with violent attitudes: Mr. Kim does not exhibit a history of problems with violent attitudes. Although his Google search had searches on "Killing coworkers and how to kill someone." Mr. Kim has no prior arrests for violence.

H10) History of problems with treatment or supervision response: Mr. Kim has no history of problems of treatment or supervision response. This is his first arrest.

*II. Clinical factors:*

C1) Recent problems with insight: Mr. Kim appears to exhibit insight in regards to his personality traits, depression, and dynamics pertaining to this crime.

C2) Recent problems with violent ideation or intent: No recent problems with violent ideation or intent.

C3) Recent problems with symptoms of major mental disorder: Mr. Kim is on medication and has stabilized.

C4) Recent problems with instability: No recent problems with behavioral or residential instability.

C5) Recent problems with treatment or supervision response: No known problems with treatment or supervision response.

*III. Risk management factors:*
R1) Future problems with professional services and plans: Mr. Kim appears compliant and no future problems with professional services and plans are contraindicated.
R2) Future problems with living situation: Mr. Kim plans to live reside with his family in Washington State.
R3) Future problems with personal support: Mr. Kim has the support of his family.
R4) Future problems with treatment or supervision response: Future problems with treatment or supervision response are not anticipated. Mr. Kim appears to be a responsible individual.
R5) Future problems with stress or coping: Adequate.

ANALYSIS OF THE CASE

Attorney Adam Solinger requested a psychological/mitigation evaluation regarding his client, Mr. Paul Kim. Mr. Kim was accused of firebombing two Tesla cars and damaging a third Tesla car at a Tesla dealership in late March 2025, during the DOGE period in our country. Mr. Kim also shot out the cameras at the Tesla Collision Center, shot out car windows, and wrote “resist” on the Tesla building.

MITIGATION POINTS

a) Mr. Kim has no history of violent behavior. He denied a history of assaults or battery domestic violence incidents. The Presentence Investigation Report indicates he has no prior juvenile or adult criminal history. Based on the fact that Mr. Kim has no prior juvenile or adult arrests or violence arrests, this is considered an aspect of mitigation. There is no evidence to indicate that Mr. Kim exhibits antisocial personality disorder nor sociopathic personality traits.
b) Mr. Kim has been incarcerated for over 16 months. He has no history of violent behavior while in detention nor has he been sent to isolation. He reported one minor write-up. The above demonstrates that he does not exhibit antisocial personality traits, that he is compliant, and he is non-violent.
c) The HCR-20, 3rd edition, a violence risk assessment instrument, assessed Mr. Kim as a low-risk to violently re-offend.
d) Mr. Kim produced valid and reliable psychological testing. Psychological testing revealed no significant mood disorders, psychosis, or personality disorders. He had an elevation on both protocols for suicide (prior issues). Personality testing indicates that he tends to be passive, withdrawn and not assertive. He generally appears shy, he has rarely dated, and he is uncomfortable in social situations. Psychological testing indicates that he is not not a violent person, rather, primarily a passive individual. The aggression subscales on both protocols were assessed as low.
e) Mr. Kim reported in 2017 he was employed in a restaurant and he believed he was underemployed; he was depressed and directionless. He put a gun to his head but he did not pull the trigger. He then decided to find purpose and began to work as a freelancer in the TV/movie industry, which he had accomplished. He reported his mood improved for the next two years. By 2020, he was depressed again and briefly consumed high quantities of alcohol. He was in therapy for six months and stabilized. In 2024, he believed he had a manic episode

and depression. He was involved in therapy for six months. Currently, Mr. Kim is on an antidepressant for a mood disorder for the last five months and he reported he has stabilized. Psychological testing was positive for suicidal ideation which likely reflects his prior suicidal gesture. Mr. Kim denied current suicidal ideation, intent or plan.

f) Mr. Kim does not exhibit any substance abuse problems.

g) Mr. Kim reported that he felt the United States was going into a fascist authoritarian direction when President Trump hired Elon Musk to run DOGE. During this time frame, the country was highly polarized regarding DOGE and immigration dynamics. Mr. Kim reported he had no animosity for Mr. Musk prior to his participation in DOGE. However, when he saw Mr. Musk gesture the Nazi salute (see Exhibit 1), he believed that the country was heading towards a fascist ideology, and he felt he had to do something. A review of his Google searches noted the crime was premeditated. Mr. Kim acknowledged that he is responsible for his criminal behaviors. He stated he picked a time, 2:30 a.m., so no one would be hurt, but he wanted to send a message. His painting of the word "RESIST" meant resist fascist ideology. When asked how he currently feels about the above, Mr. Kim reported, "I definitely overreacted. I regret what I did to all the people, for all the pain I caused the owners of the cars, my family, and everyone involved." Mr. Kim expressed genuine remorse.

A telephonic collateral interview was conducted with Mr. Phil Kim. Mr. Kim reported that his brother does have a history of depression, he tends to isolate, and he has a difficult time making friends. Mr. Phil Kim reported his brother was assessed for autism in elementary school and he appeared to have some features of autism. His brother was also assessed for ADHD in high school and he was placed on medication. His brother struggled academically in high school, however, by college, his brother was primarily an A/B student and he was on the Dean's List, but he did not graduate as he was one credit shy. Mr. Phil Kim reported his brother has no criminal history nor violent acting out. He acknowledged his brother exhibits a left political leaning. Mr. Phil Kim reported that his brother's engagement in this crime was a shock to the family. Although his brother may have been frustrated by the direction of the country, he never voiced any severe political beliefs or violence towards anyone.

To conclude, Mr. Kim has led a nonviolent life. As with millions of other Americans, he became caught up in the polarizing ideology of the two political parties. He believed he needed to express his resistance as he perceived the country moving in a fascist direction. Although millions of other Americans may have also been upset with the direction of the United States, they did not engage in criminal behavior. Mr. Kim clearly regrets his criminal behavior and appeared genuinely remorseful. As noted, he has no prior violent history. He has been afflicted with consistent depression, highlighted by a suicidal gesture in 2017. He was proactive in 2020 and 2024 regarding his depression and he was in therapy and he received mental health assistance. He currently is on psychiatric medication. He does not demonstrate an antisocial personality disorder nor sociopathy. He appears to be an individual who will be compliant with the courts once he is released from incarceration. From a risk assessment profile, Mr. Kim is assessed as a low risk to violently or criminally re-offend.

DSM-V DIAGNOSTIC IMPRESSION:
Bipolar II disorder;
Cannabis use disorder, mild, in remission secondary to incarceration;
Rule out attention deficit hyperactivity disorder, by history;
Schizoid personality traits.

I provided a diagnosis of bipolar-II disorder. Mr. Paul Kim endorsed several criteria for bipolar-II. He stated his psychologist at the time did not believe he had bipolar disorder. His brother, Mr. Phil Kim, acknowledged mood swings where he could be elevated and then depressed. Historically he appears to exhibit more depressive than hypomanic symptoms.

I also provided a diagnosis of schizoid personality traits. Individuals with schizoid personality traits exhibit a pervasive pattern of detachment from social relationships and restrictive range of expression of emotions in personal settings begins by early adulthood. As noted, Mr. Kim denied that he has any close relationships or friends. He tends to pursue solitary activities. He has never been in a relationship with a female, although he claims he is heterosexual. He lacks close friends or confidents other than relatives. This appears to be a better explanation than autism. Mr. Kim reported he does desire relationships, but he does not initiate moves to engage in relationships.

RECOMMENDATIONS

Mr. Kim would benefit from supportive therapy to help him cope more adequately with his current incarceration and moving forward in life once released from prison. Mr. Kim should also address his history of depression and interpersonal disengagement. It is recommended Mr. Kim continue to see a psychiatrist for medication management and be involved in therapy.

Respectfully submitted,

John Paglini, Psy.D.
Licensed Psychologist
*JPct: 7.17.2026*

**Exhibit 1**



**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2026, I electronically filed the foregoing DEFENDANT PAUL HYON KIM'S SENTENCING MEMORANDUM with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including Assistant United States Attorney Daniel J. Cowhig.

DATED this 6th day of 2026.

Respectfully Submitted,

*/s/ Bettina Almaden*
Bettina Almaden
Paralegal